15-3403 Eagle v. Craine May it please the Court, Your Honor, the core issue of the case before you today is that of Pearlie Crane's consent. The people who know it's not. Let's go back, Counsel. That is not the prime issue in this case. The prime issue in this case is whether the police can see somebody without a weapon turning to go into their house and they can then bust down the door and force his grandmother to sign a consent. Where is the reasonable suspicion in this case, Mr. Brown? Your Honor, the reasonable suspicion or rather the probable cause as would have been necessary as well as exigent circumstances to enter the home were indeed present at the time that Sergeant McClendon entered and attempted to or did rather search the defendant. However, the legality of the initial search of defendant within his home is actually irrelevant to the admissibility of the evidence obtained from his room. The consent given by Pearlie Crane at the moment that the officers entered, they started talking, they realized something's not quite right here. We didn't have a full grasp of this situation initially. But how are the officers in the house to have this conversation with the grandmother? They do not have a warrant. What do they have that allows them to go busting into this house at 1115 at night? They have probable cause and exigent circumstances. Okay. Where are you getting that? The probable cause arises from a number of factors. The probable cause arises from the sounds of gunshots in a residential area. In a two-block area. So under that theory, counsel, are you telling me the police could have gone and broke into anybody's house on that block that they saw? Your Honor, I think given the additional circumstances that they discovered upon investigating the circumstances that led them to that area. You're justifying it after the fact. You cannot put the horse before the cart before the horse. To be clear, Your Honor. You cannot justify this after the fact that they searched the house and found a gun. That's not a justification. Show me what gave them the authority to go into this house, because I'm not seeing it. Your Honor, the authority to enter the house was established at the moment that Sergeant McClendon saw a defendant flee. Oh, go into his house because he sees an unmarked car after gunshots or a fire coming down his street. Correct, Your Honor. But probable cause is established based on what a reasonable officer would understand of the totality of the circumstances at the time. And so no weapon being seen, that's a reasonable interpretation. He sees no weapon. He sees a man turning to go into his house, and that somehow is enough to break down the door and get into the house. Is that what you're telling me? Your Honor, Sergeant McClendon actually did testify that he saw a defendant holding his hip in a manner consistent with the possession of a firearm. Did he see a weapon? He did not physically see a weapon, no, Your Honor. Thank you. However, given that he heard gunshots in the area, given that he's... Somewhere, somewhere around there. Within a two-block radius. So really anybody in a four-block radius, Franklin, was subject to this kind of behavior. Is that what you're telling me? Anybody who turned away from a car speeding down a street and to go into their house on gunshots, they're susceptible to this. Is that what you're telling me? Your Honor, the circumstances of the crime that the officers were investigating at the time, they hear gunshots in a residential area near Midnight. So, yes. So that's what you're saying. Yes, pretty much anybody they see within that area is going to be subjected to this. Based on your theory that that somehow is probable cause? Your Honor, I believe this isn't the sort of thing that a blanket rule can be applied to. I think this has to be addressed on a case-by-case basis. Well, I think it's very, very clear a blanket rule could be applied to this, that the police need some indication that this man is committing a crime in order to bust into his house. Or they need a warrant. They didn't have either one here. So you tell me how exactly seeing a man turn to go into his house was sufficient for them? Because I still haven't heard it. Your Honor, it was sufficient for them because they do not necessarily know that it's even his house. They have come to investigate this location. They hear gunshots in the area. Mere seconds later, they come upon a scene where two individuals are standing upon the stoop of a residential porch. They see one individual flee the moment that the car comes onto the scene or the moment... There's not enough room to actually flee from this porch. Counsel, have you looked at the pictures? Tell me how, within a two-foot area, somehow he's fleeing. Your Honor, I think rapid movement away from the bottom of the porch where defendant's friend testified that he was at the moment the car came around the corner to the top of the porch and into the door is fairly consistent with consummate flight. I think that is very evident, especially from the officer's perspective, which is the critical perspective for understanding probable cause in this instance. They believe that somebody has fired a gun in a residential area. They go to the area where they believe that gun was fired, and they see two individuals standing on a porch at night. They then see that individual proceed immediately into this residence that may or may not be his. He seems to be holding an object that is consistent with a firearm, despite not knowing that it is a firearm. At that junction, the officers have a number of facts available to them that suggest that a crime involving a gun, indeed potentially a violent crime involving a gun, could be committed. The alternative to what the officers had done this night, perhaps they say, well, that's odd. Let's go get a warrant. If indeed they suspected reasonably that a violent crime with a gun could be in progress at this moment and that they just saw the individual who appears to be holding a weapon fleeing into this house, he could be going to do some serious damage. There could be something terribly wrong here. The reason that the officers were able to do that was because they had a warrant. The officer reasonably acted upon those circumstances and identified the need to enter that premises without a warrant to ensure that nobody got hurt, to ensure that nobody died. It is not an ideal Fourth Amendment circumstance, to be sure, but given the severity of the situation and given what the officers ---- What severity are we talking about? What severity are we talking about? We don't have a description of who was doing the gunshots. We don't have any information at all if it even occurred on this block, do we? That's correct, Your Honor. Okay. We do, however, have the officers' 20 years of experience. We have the only two people who appear to be on this block in the given night. No testimony suggests that anyone else was present, and indeed, most of the testimony suggests that they were completely alone. We have the furtive gestures that are congruent with the possession of a firearm, if not the visual cue of a firearm itself, and we have the headlong flight. As Defendant's Counsel correctly states, none of those instances are in and of themselves sufficient to establish probable cause. However, taken together under the totality of the circumstances, a reasonable officer would believe that a crime was being committed at this instant. However, whether the probable cause in exigent circumstances existed is irrelevant for the purposes of determining the admissibility of the particular evidence that Defendants sought to exclude. So we're going to throw out Wong Sung? We're just going to ignore all that? So if we find that they didn't have probable cause or exigent circumstances to enter that house, you're telling me that they could still enter all the proceeds of whatever they recovered in this search? Your Honor, the Fourth Amendment case law under People v. List states that it is not sufficient or it is not ideal, the law is not designed to put the officers in a worse position than they would have been after a potentially illegal stop or search. The idea is to put them in a neutral position. We want to ensure that the fruits of illicit action do not come in against a defendant, but we also want to ensure that the officers are not handcuffed in their policing duties. In this case, the functional difference between entering, realizing that Pearlie Crane was present and asking her consent, versus going up, knocking on the door, realizing that this was not Defendant's house, or it was Defendant's house, but he did not own it, that there was a different master resident of the establishment and saying, oh, wait a minute, hey, can we come in, the functional difference of evidence obtained after that point is nil under People v. List and People v. Finucane. This sufficiently serves as an independent separating circumstance that severs the causal chain and allows evidence obtained thereafter to be legitimately considered. Because there are a number of factors that one considers when looking at the separating of that causal chain. There's the temporal proximity, and admittedly, this was almost immediately after the potentially illegal entry, so it was very quick, and that's true that that goes against the State. However, the presence of intervening circumstances are clear. The police did not know that Pearlie Crane was present in this house. They had no idea what the circumstances were when they entered. They were entering to search Defendant, and indeed, they patted down Defendant. And upon doing so, they see Pearlie Crane. They begin to have a conversation with Pearlie Crane. They realize that Pearlie Crane owns this house, that Defendant lives there. It's her son-slash-grandson. And they say, hey, can we look around? Can we see Defendant's room? And she says yes. The police do not need probable cause to ask for consent to search an establishment. They don't need reasonable suspicion. Police can ask for consent for any meager hunch whatsoever, even if the initial entry and search of Defendant, which is, to be clear, his patting down to search for a firearm that they believed he had, even if that was illegal under the Fourth Amendment. Now, if you look at this case, this is a case where there is no probable cause to ask for consent. After they obtained the consent from Pearlie Crane, the causal chain was broken, and it was just the same as if they had knocked on the front door and asked her to come in. From that point on. What about the issue about the number of officers that were in the house at the time? Your Honor, the determination of the voluntariness of the consent is a matter that is due great deference for the trial court's determination. And it is true that the standard would be only if it was objectively unreasonable, only if it was against the manifest weight of the evidence. And we have here a number of circumstances upon which consent could have been voluntarily given, and the evidence suggests that it was. According to the testimony that the trial court found credible, they had a pleasant conversation about the Master Mason's organization. They were led directly to Defendant's room upon asking. In fact, they were allowed, hey, can you sign this? We have this form. We are getting your consent, your informed consent. And despite testimony to the contrary, which the trial court found incredible, manifestly incredible, they found that the form had been signed under no duress, under no deception. Everything was done according to reasonable actions of a police officer. It's true that there were a number of officers present. It is true that that is something that can go towards a coercive atmosphere. However, that alone, especially when the standard is objective unreasonableness, does not in and of itself suggest that the consent was involuntary or coerced. So given that the trial court's ruling was indeed that the voluntary, that the consent was voluntary, the evidence obtained thereafter was properly considered, because Hurley Crane led them right to the room. They established constructive possession where they saw not just the envelopes on the table saying his address, but they saw his presence. They had Defendant's statements saying that he lived there and that those were his. We have a mountain of evidence to establish constructive possession. And from there on, we establish that the consent allowed those evidence pieces to be properly considered. The police conduct moving into the house may not have been the ideal Fourth Amendment circumstance. And indeed, the initial pat-down of Defendant may have been illegal. However, the people maintained that it was not. Regardless, no evidence was obtained from that search. This is not a matter of the suppression of evidence obtained from the potentially illegal search of Defendant. This is a separate incident congruent with people versus, or United States versus LIS, excuse me, in which they discovered new circumstances upon, in LIS, illegally entering a location. They said, oh, something is odd here. We didn't know this woman was here. We didn't know that there might be other things here. Let's ask if we can keep looking. The officers should not be placed in a worse situation than they would have been otherwise, simply because their initial entry and search of Defendant may have been illegal. The Fourth Amendment discourse is very clear on that. And for that reason, we ask that you maintain the trial court's decision. Thank you. I will try to be brief. The State's ---- Let's talk about the attenuation of the illegally gotten evidence. Did the consent form attenuate this for many years? No, it did not. They only obtained a consent form by virtue of bursting into her house late at night. They should have never been there in the first place to have a discussion with her. She was in her bedroom, according to McClendon, at 1115, a 75-year-old grandmother. There's no way they would have had this consent without the illegal entry. It's directly tied to the illegal entry. But they never forced her, coerced her, or manipulated her in any way to sign the consent form, though, did they? She testified that they did. And that's part of my argument that her testimony is more credible. But that's actually irrelevant to the other reason to suppress it as the fruit of the search. They don't have to coerce her for it to be the fruit of this illegal entry. And they don't have to intend to coerce her for it to be inherently coercive, like in Graff, where, again, the parents signed a consent form and gave the officers coffee, and it was still found that this ---- that would support ---- two officers forcing their entry would support a claim of coercion. And this argument by the State about this ---- the attenuation analysis and breaking the causal chain is new. Just like they argued one claim of probable cause below, a different one in the brief, and now are going back to an issue they didn't brief, that there was probable cause to arrest for a gun crime. I think the State's spinning its wheels because none of these arguments hold water. And, again, the attenuation analysis was not argued in the brief. If this case is going to turn on this new argument, that oral argument, that there was a break in the causal chain, I would appreciate an order asking both parties to submit supplemental briefing on that. But I don't think we get there. I think under Wong-Sun, under typical attenuation analysis, they would not have obtained consent without this unlawful entry. It was a direct result of that, not just the consent, but they didn't even ask for consent until they smelled marijuana in the house. And they didn't smell marijuana in the house until they were illegally in the house. It's like an illegal search where you then rely only on that illegally viewed evidence to get a warrant, which is improper. You shouldn't be able to rely on this illegal smell of supposed cannabis to get consent. They should never have been there in the first place. I would note about holding the hip, this court in Horton recently, I think just this past December, found where an officer saw even metal in someone's waistband, and then that person avoided contact with the police and went inside, that that wasn't enough to even believe that it was a gun, let alone to go inside and arrest. Again, another December decision, Telly Flunder cited a case, Inmate F.J., where there was a gang disturbance. The officer arrived, saw the defendant put something in his pocket, and the court held that fact susceptible to an innocent explanation and not enough. And so holding a hip, especially with his hunch, is proven wrong. We see this in so many cases, and it seems there's an epidemic of young black men in the city having some degenerative hip problem. It's just not enough to believe that this person was involved in a crime or even possessed a gun, let alone involved in a crime. Even after Aguilar here, where you're allowed to have a gun in public, my client was on his home even before Aguilar on a McDonald's, and as Horton recognized, you still have the right to, it's not per se illegal to have a gun on your own porch or on your own property. So there was no reason for the officers to be here in the house. They could not have smelled the cannabis without the illegal entry. They could not have obtained the consent without the illegal entry. And even if there is some sort of attenuation, it still was from an inherently coercive atmosphere that would invalidate the consent to search, despite any potential attenuation. So I'd ask you to reverse and suppress the evidence. Thank you. Thank you. All right. We want to thank counsels for presenting a very interesting issue in a well-argued manner, and the court will take it under advisement. And again, as I indicated, Justice Gordon, although not here today, will be listening to the tapes and will also participate in the decision. Thank you very much.